UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**KRISTINE BOWLING**,                     Case Number 1:13 CV 1361

    Plaintiff,                     Judge Donald C. Nugent

    v.                     REPORT AND RECOMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.                     Magistrate Judge James R. Knepp, II

## INTRODUCTION

Plaintiff Kristine Bowling seeks judicial review of Defendant Commissioner of Social Security's decision to deny supplemental security income ("SSI"). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated June 20, 2013). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for SSI on October 21, 2009, alleging disability beginning January 1, 2001, due to lupus, a blood disorder, pain, and arthritis. (Tr. 13, 165). She also claimed to suffer from borderline personality disorder, confusion, and anxiety attacks since March 2010. (Tr. 200-01). Her claim was denied initially and on reconsideration. (Tr. 112, 118). Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 122). At the hearing, Plaintiff, represented by counsel, and a vocational expert ("VE") testified. (Tr. 32). On March 16, 2012, the ALJ concluded Plaintiff was not disabled. (Tr. 10). Plaintiff's request for

review was denied, making the decision of the ALJ the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 1481. On June 20, 2013, Plaintiff filed the instant case. (Doc. 1).

FACTUAL BACKGROUND

*Plaintiff's Background, Vocational Experience, and Daily Activities*

Plaintiff was 41 years old on the date she applied for SSI. (Tr. 25). She has a G.E.D. and past relevant work experience as a food service manager, bartender, house painter, and artist. (Tr. 25). Plaintiff averred she is most limited by lupus due to physical pain on the bottom of her feet and in her hands and arms that restricts her ability to get out of bed three times per week. (Tr. 43-45, 54). She claimed to have a bad day at the hearing, saying, "[i]f I didn't have to be in court, I would not be dressed and out of bed." (Tr. 44).

Plaintiff is a widow who lived with her parents in a one-story home. (Tr. 38, 40). Plaintiff admitted her parents took good care of her, but said "a lot of times . . . I'll go off on my own for a few days and just - - I'll just write or just be by myself and not talk to anybody." (Tr. 52). Concerning daily activities, Plaintiff prepared meals, cleaned the cat box, took out the trash, visited friends, painted with her friend's children (although she said she was unable to paint like she used to), worked puzzles, wrote poetry, talked on the phone, used a computer, and on a good day, went to the craft store or took her parents' dog for a walk. (Tr. 38-39, 44, 54, 55, 291). Plaintiff's driver's license was suspended in 2007 and she did not expect to have it reinstated due to her hands going numb, anxiety issues, and road rage. (Tr. 38). To get around, particularly to the grocery store or to get art supplies, Plaintiff relied on her parents or a friend. (Tr. 39).

*Medical Evidence*

Plaintiff went to the emergency room in Cincinnati, Ohio, on November 19, 2008, where she complained of left-sided chest pain, shortness of breath, cough, headache, weakness, tingling

2

in her hands and feet, syncope, and menorrhagia. (Tr. 219, 224, 239). She told one treating physician she was in Cincinnati to take care of a friend who recently had a stroke and another that she planned to be in Cincinnati for a while. (Tr. 245, 248). She was not currently working but hoped to work as a freelance artist. (Tr. 248). Plaintiff received a blood transfusion then was told to continue her Coumadin regimen before being discharged on November 22, 2008 in stable condition. (Tr. 239). At the time of discharge, Plaintiff complained about gynecology's conservative plan for outpatient care. (Tr. 239). Despite having an incomplete record, attending physicians noted Plaintiff's history of hypertension, deep vein thrombosis, and pulmonary embolism with treatment including Coumadin, Lisinopril and Ambien. (Tr. 221, 239, 241). A drug screening came back positive for benzodiazepines, tetrahydrocannabinol, and opiates. (Tr. 241). While at the hospital, physical examinations did not reveal any abnormal findings. (Tr. 241, 245, 248-49).

On March 5, 2010, chest x-ray examinations were normal. (Tr. 282-86).

On July 23, 2010, plaintiff presented to rheumatologist Marie Kuchynski, M.D., for evaluation of possible lupus. (Tr. 325). Plaintiff weighed 267 pounds and a physical examination was unremarkable aside from crepitus in her knees. (Tr. 325). Dr. Kuchynski assessed antiphospholipid ab syndrome and probable lupus then prescribed Celebrex and asked for a follow up visit in two weeks. (Tr. 326).

Plaintiff followed up with Dr. Kuchynski on August 27, 2010, and said Celebrex caused stomach pain, she ran out of Coumadin, and depression symptoms had increased. (Tr. 324). Dr. Kuchynski prescribed Zoloft and plaquenil and advised Plaintiff to continue taking the rest of her medications as prescribed. (Tr. 324).

3

On February 25, 2010, Plaintiff presented to primary care physician Karen Hummel, M.D., as a new patient. (Tr. 341). Dr. Hummel referred Plaintiff to hematologist Murkesh C. Bhatt and rheumatologist Marie Kuchynski, M.D., for treatment of lupus and history of hypertension and deep vein thrombosis. (Tr. 342).

Plaintiff followed up with Dr. Hummel's office on March 11, 2010, May 17, 2010, July 26, 2010, August 27, 2010, December 29, 2010, February 16, 2011, and January 10, 2012, generally for medication refills and at times for complaints of dizzy spells (Tr. 337, 391) or anxiousness (Tr. 335, 399, 459). (Tr. 331-32, 335-36, 337-38, 339-40, 341-42, 391-92, 399-400, 459). Plaintiff's physical examinations were consistently unremarkable, including no reported fever or significant strength or range of motion limitations. (*Id*.). Plaintiff weighed approximately 262-273 pounds during this time. (Tr. 335, 337, 339, 341, 391, 399, 459).

Plaintiff treated with Dr. Bhatt only four times between March 3, 2010, and January 27, 2012. (Tr. 438-41). At her initial visit, Plaintiff denied history of weight loss or alcohol or drug abuse and had a normal physical examination. (Tr. 441-42). Dr. Bhatt recommended Plaintiff take folic acid and ordered various blood tests. (Tr. 442). When told Plaintiff did not regularly take Coumadin, Dr. Bhatt advised taking the drug "religiously". (Tr. 440). On January 20, 2012, Dr. Bhatt noted Plaintiff contracted hepatitis-C from a tattoo needle and prescribed injectable Arixtra. (Tr. 439).

On July 23, 2010, Plaintiff complained of a low-grade fever, fatigue, double vision, itchy eyes, tinnitus, hearing loss, vision loss, rhinitis, leg swelling, hives when exposed to sun, cold induced hives, dizziness, muscle spasm, night sweats, insomnia, anemia, memory loss, syncope, and arm numbness. (Tr. 325). On examination, Dr. Kuchynski recorded Plaintiff's weight of 267

pounds and noted no synovitis, warmth, swelling, or tenderness in Plaintiff's joints, but bilateral crepitus in her knees. (Tr. 325).

Dr. Kuchynski completed a medical source statement on November 17, 2010, where she noted Plaintiff's diagnosis of lupus and antiphospholipid antibody syndrome, which medication treated without known side effects. (Tr. 322-23, 379). Dr. Kuchynski admitted she had only treated Plaintiff twice and recommended contacting Plaintiff's primary physician to obtain information regarding Plaintiff's functional abilities. (Tr. 323, 379).

On January 12, 2011, Plaintiff told Dr. Kuchynski she heard marijuana was available in a pill form and asked for a prescription. (Tr. 428). Dr. Kuchynski said she could not prescribe Marinol and referred her to pain management. (Tr. 428). Upon examination, Plaintiff weighed 271 pounds, had facial rashes and a limited range of motion in her wrist, was not in acute distress, had nonfocal neurologic results, normal affect, normal gait, and no synovitis, warmth, tenderness or swelling in her joints. (Tr. 428).

On February 21, 2011, Plaintiff presented to Tony G. Labaidi, D.O., for pain management. (Tr. 417). Plaintiff said she discontinued prescribed opiates because she did not experience pain relief, and instead felt disoriented and sleep deprived. (Tr. 417). Dr. Labaidi discontinued hydrocodone, recommended starting a TENS unit, and prescribed Marinol because Plaintiff said smoking marijuana previously reduced pain. (Tr. 417-18).

Plaintiff had two follow-up pain management appointments with Terry Ross, D.O. (Tr. 411-12, 414-15). Plaintiff said lupus caused constant, stabbing, throbbing pain made worse by sitting, standing, bending, lifting, sneezing, coughing, steps, and the cold but improved with rest and medication. (Tr. 411, 414). She had unremarkable physical examinations, including normal range of motion and straight leg raise testing. (Tr. 411-12, 414-15).

5

On March 28, 2011, Dr. Ross recommended a cervical MRI due to decreased range of motion in her wrists, increased headaches and numbness, and burning and tingling bilaterally in her hands. (Tr. 415). Use of the TENS unit was continued as Plaintiff said it provided "excellent relief". (Tr. 415).

On May 2, 2011, Dr. Ross prescribed Marinol, declined to fill out Plaintiff's disability paperwork, and noted her urine test was inconsistent for Vicodin, which was ordered by her rheumatologist. (Tr. 412). On the same day, Dr. Kuchynski advised Plaintiff she could not take Marinol and Vicodin. (Tr. 422). Plaintiff's stiffness and swelling was stable, she weighed 262 pounds, had pain with range of motion in most joints, and had crepitus in her knees. (Tr. 422).

On April 27, 2011, Dr. Hummel opined Plaintiff had the physical residual functioning capacity ("RFC") to sit for two-to-three hours in an eight-hour workday, stand or walk for less than one hour in an eight-hour workday, lift up to ten pounds occasionally, required ten-to-fifteen minute breaks every one-to-two hours, and could be expected to be absent from work for up to one or two days every one-to-two weeks. (Tr. 380-81). Treatment notes from the same day revealed a generally unremarkable physical examination, including no complaints of fever. (Tr. 389).

An April 28, 2011 MRI of Plaintiff's cervical spine revealed degenerative disc disease from C4 through C7 with slight cord compression to the left of the midline at C5-6 and probable compression of the exiting right nerve root at C6-7. (Tr. 384). X-rays taken May 4, 2011 of Plaintiff's wrist revealed posttraumatic and secondary degenerative changes of the right wrist but no evidence of inflammatory arthritis. (Tr. 385).

On May 5, 2011, Dr. Kuchynski determined Plaintiff had the physical RFC to sit, stand, or walk for less than two hours in an eight-hour workday; lift up to ten pounds occasionally,

would miss five-to-seven days of work per month; and would require breaks at will during the workday. (Tr. 383). Further, Plaintiff could not stoop, kneel, or bend. (Tr. 383).

On January 25, 2012, Dr. Hummel determined Plaintiff had the physical RFC to sit for less than two hours in an eight-hour workday, stand or walk for less than one hour in an eight-hour workday, lift a maximum of five pounds occasionally, would require an unpredictable number of breaks, and would miss between one and three days of work every one-to-two weeks. (Tr. 435). Dr. Hummel added that Plaintiff's anxiety, fatigue, and clotting disorder required injectable medications. (Tr. 435).

Also on January 25, 2012, Jeffrey R. Neher, M.D., evaluated Plaintiff's elevated liver enzymes and history of hepatitis C. (Tr. 454). Plaintiff complained of frequent nausea, occasional vomiting, unintentional weight loss, and mid-to-lower abdominal pain. (Tr. 454). Plaintiff weighed 271 pounds and her physical examination was grossly normal, including no rashes and a well-developed, well-nourished appearance. (Tr. 455). Dr. Neher diagnosed abdominal pain, nausea with vomiting, weight loss, and hepatitis C. (Tr. 455).

### State Agency Review

Murrell Henderson, D.O., performed a consultative examination on February 28, 2010. (Tr. 269). There, Plaintiff complained of pain in her joints, knees, shoulders, and hips; tremors; fatigue; memory loss; and panic attacks. (Tr. 269). Since age fifteen, Plaintiff said she smoked two packs of cigarettes per day but recently cut back. (Tr. 269). Dr. Henderson recorded Plaintiff's weight at 262 pounds and in an accompanying Manual Muscle Testing form, reported all of Plaintiff's motor findings and ranges of motion were normal. (Tr. 270, 272-75). Dr. Henderson concluded Plaintiff's ability to tolerate prolonged standing and walking could be limited by lupus; however, no significant deficits were noted during the examination. (Tr. 270).

7

On March 15, 2010, James F. Sunbury, Ph.D., performed a consultative examination. (Tr. 288). Plaintiff divulged that she was adopted, left home when she was sixteen, had a child when she was twenty (who she gave up for adoption), and married in 2004. (Tr. 288). In 2007, Plaintiff's husband committed suicide. (Tr. 288). Plaintiff rented a room in Cincinnati or stayed with her parents in Medina. (Tr. 288). Plaintiff quit high school twice and was expelled once but later earned her G.E.D. and attended Kent State University for three months before being "thrown out for pot." (Tr. 289). She most recently worked at a deli, but was fired due to the owner's family problems. (Tr. 289). Dr. Sunbury indicated Plaintiff smoked cigarettes and marijuana, last used heroin four years ago, drank about sixteen ounces of bourbon daily, and had history of heavy cocaine and hallucinogen use. (Tr. 289). Plaintiff also had a history of community problems, including killing cats, starting fires, driving under the influence, and spending three days in jail "here and there". (Tr. 289).

Plaintiff's examination was unremarkable. (Tr. 290). Dr. Sunbury found her abilities to relate to others and withstand the stress and pressures associated with day-to-day work activity moderately impaired due to mood and personality factors; her ability to understand, remember, and follow instructions unimpaired; and her ability to maintain attention, concentration, persistence, and pace to perform routine tasks moderately impaired due to bipolar I disorder, anxiety disorder, and personality disorder. (Tr. 291-92). Finally, Dr. Sunbury indicated Plaintiff's ability to manage funds was compromised by substance dependence and abuse. (Tr. 292).

On March 17, 2010, state agency medical consultant J. DeBorja, M.D., found insufficient medical evidence to support allegations of degenerative joint disease. (Tr. 296).

8

On March 19, 2010, state agency medical consultant Caroline Lewin, Ph.D., reviewed Plaintiff's records and completed a metal RFC assessment and psychiatric review technique, finding Plaintiff was capable of simple and complex tasks, could interact with others occasionally and on a superficial basis, and would work best in a solitary, routine environment where she could concentrate as needed. (Tr. 297-99). Functionally, Plaintiff was mildly limited in activities of daily living and moderately limited in abilities to maintain social functioning and concentration, persistence, or pace. (Tr. 311). Plaintiff previously experienced one or two episodes of decompensation of extended duration. (Tr. 311). On November 9, 2010, Tonnie Hoyle, Psy.D., affirmed Dr. Lewin's mental RFC determination as written. (Tr. 368).

Also on March 19, 2010, state agency medical consultant R. Flores, M.D., indicated Plaintiff had a history of joint pain but found no documentation of Plaintiff's lupus diagnosis. (Tr. 316). He concluded her allegations of impaired function were unsupported by the record and not credible. (Tr. 316).

State agency medical consultant, C. Newill, M.D., opined on June 16, 2010 that Plaintiff's physical impairments were not severe alone or in combination. (Tr. 294).

***ALJ Decision***

The ALJ determined Plaintiff suffered from severe impairments including systemic lupus erythematosus, secondary antiphospholipid antibody syndrome, arthritis, hypertension, hepatitis C, history of wrist fracture with degenerative changes, history of deep vein thrombosis and pulmonary embolism, degenerative disc disease of the cervical spine, gastroesophageal reflux disorder, obesity, bipolar disorder, anxiety disorder, and personality disorder. (Tr. 15).

Next, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (Tr. 16). The ALJ found Plaintiff had the

9

RFC to perform a range of light work except she could occasionally use the bilateral upper extremities for overhead reaching; occasionally bend, stoop, kneel, crouch, and crawl; and occasionally climb ramps and stairs. (Tr. 18). Plaintiff could never climb ladders, ropes, or scaffolds and was limited to work which required the ability to maintain attention and concentration to perform simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements or quotas. (Tr. 16). Plaintiff could only have occasional contact with coworkers and supervisors and no direct contact with the general public in an environment with only occasional changes to the work setting and occasional work-related decision making. (Tr. 18).

Considering Plaintiff's age, education, work experience, RFC, and VE testimony, the ALJ determined Plaintiff could work as a linen folder, garment packer, or remnant sorter. (Tr. 25-26). Thus, the ALJ determined Plaintiff was not disabled. (Tr. 26).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court

cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can she perform past relevant work?

5. Can the claimant do any other work considering her RFC, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and

11

meets the duration requirements. 20 C.F.R. §§ 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff argues the ALJ: 1) erred by not finding her impairments met or equaled listing 14.02(A) relating to systemic lupus erythematosus ("SLE"); and 2) improperly considered the opinions of Drs. Hummel, Kuchynski, Henderson, Flores, DeBorja, and Newill. (Doc. 14). Each argument is addressed in turn.

### *Listing 14.02(A)*

First, Plaintiff argues she satisfies the requirements of listing 14.02(A). (Doc. 16, at 18). The listing of impairments is used to determine whether a claimant's impairments meet or medically equal a particular listing. If a claimant meets the requirements of a listed impairment, then the claimant is considered disabled. 20 C.F.R. § 404.1520(d). If not, the sequential evaluation process continues and the ALJ must determine whether a claimant's impairment or combination of impairments is the "medical equivalence" of a listed impairment. *Id*. An impairment is equivalent to a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). In order to determine whether a claimant's impairments are medically equivalent to a listing, the ALJ may consider all evidence in a claimant's record. 20 C.F.R. § 404.1526(c).

Listing 14.02(A) requires SLE accompanied by the "[i]nvolvement of two or more organs/body systems, with: [o]ne of the organs/body systems involved to at least a moderate level of severity; and [a]t least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)." 20 C.F.R. pt. 404, subpart P, app. 1, § 14.02. "Major organ or body system involvement can include: Respiratory (pleuritis, pneumonitis), cardiovascular

12

(endocarditis, myocarditis, pericarditis, vasculitis), renal (glomerulonephritis), hematologic (anemia, leukopenia, thrombocytopenia), skin (photosensitivity), neurologic (seizures), mental (anxiety, fluctuating cognition ('lupus fog'), mood disorders, organic brain syndrome, psychosis), or immune system disorders (inflammatory arthritis)." *Id.* at § 14.00D1. As an aside, listing 14.02(B) requires "[r]epeated manifestations of SLE, with at least two of the constitutional symptoms or signs" and one of the following at the marked level: 1) limitation of activities of daily living; 2) limitation in maintaining social functioning; or 3) limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. *Id.* at § 14.02(A)

Here, Plaintiff claims the ALJ "erroneously stated the criteria of Listing 14.02 was not met" when he found "no evidence that the claimant's SLE results in marked limitation of her activities of daily living, social functioning or ability to complete tasks in a timely manner due to deficiencies in concentration, persistence or pace." (Doc. 14, at 15). Plaintiff further avers her musculoskeletal and mental systems are involved in at least a moderate level of constitutional symptoms or signs including severe fatigue, memory loss, fever, and involuntary weight loss. (Doc. 14, at 16).

However, Plaintiff cited only a portion of the ALJ's findings concerning listing 14.02. Upon review, the ALJ engaged in a much more substantial analysis. To this end, the ALJ wrote:

> According to the claimant's treating rheumatologist, laboratory testing confirmed her diagnosis of systemic lupus erythematosus (SLE) in July 2010 (Ex. 12F, p.12). However, there is no evidence of organ involvement or repeated manifestations of the claimant's SLE characterized by multiple constitutional symptoms. The claimant has alleged severe fatigue to be associated with her lupus, but fatigue was only intermittently reported to treatment providers. However, the claimant has not experienced fever, weight loss or other

13

constitutional symptoms. The claimant also reported persistent low-grade fevers during a July 2010 office visit with her treating rheumatologist, but progress notes consistently indicate that her temperature was normal (Ex. 13F, [Ex.] 12F, pp.1-2, 7-14, 20F, pp. 4-6, 14-16, 22F, p.3 and 21F). The claimant reported involuntary weight loss of eleven pounds in two weeks during a January 2012 office visit. However, her weight of 271 pounds as recorded during that visit, was actually slightly higher than it had been throughout the period for adjudication. Physicians recorded the claimant's weight to be between 273 pounds in March 2010 (Ex. 13F, p.11), 259 in July 2010 (Ex. 13F, p. 7) and 262 pounds in May 2011 (Ex. 21F, p.1). Furthermore, as discussed more fully below, there is no evidence that the claimant's SLE results in marked limitation of her activities of daily living, social functioning or ability to complete tasks in a timely manner due to deficiencies in concentration, persistence or pace. The criteria of Listing 14.02 are not met.

(Tr. 16). The ALJ found Plaintiff had a mild restriction in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, and pace. (Tr. 17). In support, the ALJ pointed to Plaintiff's abilities to prepare her own meals, launder her own clothes, care for pets, take out the trash, shop in stores, and engage in hobbies including painting and poetry. (Tr. 17). The ALJ also considered Plaintiff's testimony that on "bad days," she passed the time by reading and doing puzzles. (Tr. 17).

In support of her argument, Plaintiff points to discrete records where she reported joint pain, fatigue, low grade fevers, and weight loss (Doc. 14, at 16, *citing* Tr. 325, 380, 422, 432, 455). However, many of these findings, particularly related to fatigue and weight loss, are based on Plaintiff's self-reported symptoms (Tr. 325, 422, 431, 455), which is problematic considering the ALJ's unchallenged negative credibility finding. (Tr. 19). Moreover, the relevant inquiry is not whether substantial evidence could support an alternative result, but whether substantial evidence supports the ALJ's finding. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("[I]f substantial evidence supports that ALJ's decision, this Court defers to that finding

14

even if there is substantial evidence in the record that would have supported an opposite conclusion.").

As the ALJ found, Plaintiff only intermittently complained of fatigue (Tr. 325, 435), generally reported no fever (Tr. 335, 337, 339, 341, 389, 391, 399, 459), and her weight was consistently between about 260 and 270 pounds (Tr. 270, 325, 335, 337, 339, 341, 391, 399, 422, 428, 459). Plaintiff denied a history of weight loss to Dr. Bhatt (Tr. 441-42) and the only "diagnosis" of weight loss came from Dr. Neher, but that was based on Plaintiff's self-reported eleven-pound involuntary weight loss (Tr. 455). At that visit, Plaintiff weighed 271 pounds, which was at the higher end of her normal documented weight. (Tr. 455). Moreover, numerous treatment notes contain grossly normal physical examinations, including (with one exception) no documented facial rashes. (Tr. 241, 245, 248-49, 331-32, 335-42, 391-92, 399-400, 411-12, 414-15, 441-42, 455, 459 *but see* Tr. 428).

Mentally, Plaintiff reported anxiety to her primary care physician, Dr. Hummel, but her anxiety was described as stable and Plaintiff averred medication effectively reduced symptoms. (Tr. 335, 392, 399, 459). Further, Plaintiff did not follow-up on Dr. Hummel's recommendation that she see a psychiatrist. (Tr. 54-55).

Concerning daily activities, Plaintiff prepared meals, looked after her parents' dog, cleaned the cat box, took out the trash, visited friends, painted with her friend's children (although she was unable to paint rooms or pictures like she used to), worked puzzles on bad days, wrote poetry, talked on the phone, used a computer, and went to the craft store on good days. (Tr. 39, 44, 54, 55, 291). The ALJ also commented on Plaintiff's history of sporadic and conservative treatment. (Tr. 19, 21).

15

In short, substantial evidence supports the ALJ's finding that Plaintiff does not have moderately severe constitutional symptoms including fevers, involuntary weight loss, fatigue, and mental limitations. Therefore, substantial evidence also supports the ALJ's finding that Plaintiff's impairment or combination of impairments does not meet or medically equal listing 14.02(A).

***Treating Physician Rule***

Next, Plaintiff argues the ALJ failed to properly consider the opinions of Drs. Kuchynski, Hummel, Henderson, Flores, DeBorja, and Newill. (Doc. 14, at 16-8). These arguments implicate the well-known treating physician rule.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id.* A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (citing *Rogers*, 486 F.3d at 243). Accordingly, failure to give good

16

reasons requires remand. *Id.* at 409–410.

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). "If the ALJ does not accord the opinion of the treating source controlling weight, it must apply certain factors" to assign weight to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 416.902. A medical provider is *not* considered a treating source if the claimant's relationship with him or her is based solely on the claimant's need to obtain a report in support of their claim for disability. § 416.902 (emphasis added). Non-treating sources are physicians, psychologists, or other acceptable medical sources who have examined the claimant but do not have, or did not have, an ongoing treatment relationship with them. § 416.902. This includes a consultative examiner. § 416.902.

Last in the medical source hierarchy are non-examining sources. These are physicians,

17

psychologists, or other acceptable medical sources who have not examined the claimant, but review medical evidence and provide an opinion. § 416.902. This includes state agency physicians and psychologists. § 416.902. The ALJ "must consider findings and other opinions of [s]tate agency medical and psychological consultants . . . as opinion evidence", except for the ultimate determination about whether the individual is disabled. § 416.927.

Drs. Kuchynski and Hummel

Plaintiff argues the ALJ "unreasonably" rejected the opinions of treating rheumatologist Dr. Kuchynski and treating internist Dr. Hummel. (Doc. 14, at 17). However, reasonableness is not the standard by which the Court evaluates the ALJ's decision; rather, it must affirm the ALJ's decision if that decision is supported by substantial evidence, even if the evidence supports a different conclusion or the Court would have come to a different conclusion than the ALJ. *Jones*, 336 F.3d at 477. With that in mind, the Court reviews the ALJ's treatment of the opinions of Drs. Kuchynski and Hummel.

The ALJ set forth:

The undersigned gave Drs. Kuchynski and Hummel's opinions limited weight as they are not supported by objective findings in their treatment notes and inconsistent with the objective evidence as a whole. Specifically, during her several physical examinations of the claimant, Dr. Kuchynski never noted swelling, warmth, synovitis or tenderness of the claimant's joints, a characteristic symptom of lupus. While a facial rash was noted by Dr. Kuchynski in January 2011 (Ex. 22F, p. 9), it was not noted during any other office visit (Ex. 12F, pp. 8, 9-10; 22F, p.3). Dr. Hummel's treatment notes reflect few, sporadic clinical findings and none were cited in support of her opinion as to the claimant's functional limitations.

(Tr. 23).

As stated in his decision, the ALJ complied with his regulatory obligations by commenting on the supportability and consistency of the opinions of Drs. Kuchynski and Hummel. (Tr. 23). Therefore, the ALJ did not violate the treating physician rule. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011) (noting the "good reasons" rule does not require an "exhaustive factor-by-factor analysis").

<u>Dr. Henderson</u>

Plaintiff argues that although the ALJ acknowledged the evidence of record from consultative examiner Dr. Henderson, he failed to explain what weight, if any, he afforded the opinion. (Doc. 14, at 17). Upon review, the ALJ did not clearly afford weight to Dr. Henderson's opinion. However, for the following reasons, any error is harmless.

First, the ALJ considered the relevant evidence of record, rather than omitting or disregarding Dr. Henderson's report, rendering the harmless error rule applicable. *Contra Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 750 (6th Cir. 2007) (applying the harmless error rule "where the ALJ entirely failed to address the primary treating source's presumptively supportable opinion - plainly risks having the exception swallow up the rule.").

Second, Plaintiff misconstrues Dr. Henderson's findings by declaring, "Dr. Henderson opined that [Plaintiff] would be unable to perform activities which involved prolonged standing or walking due to her lupus." (Doc. 14, at 17). But Dr. Henderson made no such affirmative statement. Rather, he said, "[t]here [we]re no significant deficits noted in the examination[]" and "[Plaintiff's] ability to tolerate prolonged standing and walking *may be* limited by her lupus *although no significant deficits were noted at this time*." (Tr. 270) (emphasis added).

19

Third, Plaintiff's argument is unpersuasive because Dr. Henderson did not make any observations that would be inconsistent with the RFC assessment. *See*, *Hunter v. Comm'r of Soc. Sec.*, 2013 WL 4496249, at * 16 (E.D. Mich.). Indeed, the ALJ limited Plaintiff to a range of light work, which would account for any limitation in prolonged standing and walking. (Tr. 18); *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006) (citing *Wilson*, 378 F.3d at 547) (harmless error can occur "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion").

Finally, Dr. Henderson, as a one-time consultative examiner, is near the bottom of the "treating physician" hierarchy and his opinion is entitled to less weight than that of a treating physician. § 416.902.

Because: 1) the ALJ acknowledged the report; 2) Plaintiff misconstrues Dr. Henderson's findings; 3) the RFC is not inconsistent with Dr. Henderson's opinion; and 4) Dr. Henderson is a one-time examiner, the undersigned finds any failure to afford weight to the opinion was harmless. Therefore, Plaintiff's argument regarding Dr. Henderson is not well-taken.

Drs. Flores, DeBorja, and Newill

Plaintiff next argues the ALJ failed to state what weight, if any, he afforded to the opinions of state agency medical consultants Drs. Flores, DeBorja, and Newill. (Doc. 14, at 17). Concerning these doctors, the ALJ wrote:

> R. Flores, M.D., J. DeBorja, M.D. and C. Newill, M.D. each independently reviewed the claimant's case file in January and March 2010 (Ex. 7F, 8F and 11F). None found sufficient medical evidence to establish [] a severe, medically determinable impairment. Drs. DeBorja and Newill noted that the claimant's lupus was not established by laboratory testing and while hospitalized due to anemia, this condition would not be expected to persist for twelve consecutive months. Dr. Flores, a Board-certified specialist in rheumatology, specifically

20

noted that the basis for the claimant's reported history of lupus was unclear and undocumented by available medical evidence (Ex. 11F, p.2). While the conclusions of Drs. Flores, DeBorja and Newill are consistent with the evidence available to them at the time they reviewed the claimant's case file, evidence received at the hearing level supports a finding of medically determinable, severe impairments.

(Tr. 24).

As stated above, the ALJ afforded less than full weight to the state-agency consultants' opinions because they did not consider the full record, which supported more severe limitations. (Tr. 24). In other words, the opinions were inconsistent with the record as a whole. Further, as non-examining physicians, the ALJ permissibly afforded less deference to their opinions. § 416.902. Thus, the ALJ did not err in his treatment of the opinions of Drs. Flores, DeBorja, and Newill.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI benefits applied the correct legal standards and is supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).

21